# United States Court of Appeals
## For the First Circuit

No. 16-1309

ARABIAN SUPPORT & SERVICES CO., LTD.,

Plaintiff, Appellant,

v.

TEXTRON SYSTEMS CORP.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Haig V. Kalbian, with whom D. Michelle Douglas, Kalbian Hagerty LLP, Martin F. Gaynor III, Nicholas D. Stellakis, and Manion Gaynor & Manning LLP were on brief, for appellant.
Edwin John U, with whom John A. Tarantino, Brian R. Birke, Adler Pollock & Sheehan P.C., Eugene F. Assaf, Erin C. Johnston, Ronald K. Anguas, Jr., and Kirkland & Ellis LLP were on brief, for appellee.

April 19, 2017

**LIPEZ, <u>Circuit Judge</u>.**  In this diversity action, Arabian Support & Services Co. ("ASASCO"), a Saudi Arabian business, seeks compensation for assisting Textron Systems Corporation in its efforts, over a number of years, to complete a deal to sell sensor fuzed weapons ("SFWs") to the Saudi government.  ASASCO claims that Textron failed to abide by a promise to supplement the modest fees paid under the parties' written consulting agreements through an "offset" arrangement linked to the weapons sale.[1]  The district court granted summary judgment for Textron on all of ASASCO's claims after allowing limited discovery and declining to provide ASASCO an opportunity to amend its complaint.

Although we agree that ASASCO's contract and tort claims are not viable, we conclude that the district court erroneously dismissed ASASCO's Chapter 93A misrepresentation claim based

---

[1] The U.S. Department of Commerce describes "offsets" as "the practice by which the award of defense contracts by foreign governments or companies is conditioned upon commitments from the defense contractor to provide some form of compensation to the purchaser."  U.S. Dep't of Commerce, Bureau of Indus. & Sec., <u>Guidance for Complying with the Bureau of Industry and Security's Procedures for Reporting on Offsets Agreements Associated with the Sales of Weapon Systems or Defense-Related Items to Foreign Countries or Foreign Firms</u>, https://www.bis.doc.gov/index.php/other-areas/strategic-industries-and-economic-security-sies/contact-the-office-of-strategic-industries-a-economic-security/guidance-for-reporting-on-offset-agreements (last visited March 16, 2017).  That compensation can be directly related to the purchase, perhaps through subcontracting within the purchasing country, or may take the form of other types of investments made in the purchasing country.  <u>Id.</u>

solely on the failure of the contract claim.  See Mass. Gen. Laws Ann. ch. 93A, § 11.  Textron offers no persuasive alternative rationale to support the court's ruling.  Hence, ASASCO is entitled to proceed with its claim that Textron engaged in an unfair business practice by procuring ASASCO's agreement to low-fee consulting contracts with the promise of a future offset benefit and then, after successfully signing the weapons deal, disclaiming any additional financial obligation to the Saudi company. Accordingly, we vacate the summary judgment in part and remand for further proceedings on ASASCO's misrepresentation theory.

## I.

We will not review in full the parties' lengthy relationship, which developed largely through interactions between Mansour Al-Tassan, ASASCO's president, and Avedis Boyamian, Textron's Director of Middle East Business Development.  As the history is well known to both parties, we choose here to recount only those facts pertinent to our decision.

### A. The Consulting Agreements

For three-plus years -- from March 2005 through August 2008 -- Textron and ASASCO signed successive consulting contracts providing ASASCO with a monthly retainer of $10,000.  Beginning September 1, 2008, the consulting contract was extended in increments of one to three months on a no-fee basis.  That arrangement continued for a year, until a new two-year agreement

- 3 -

was signed that set ASASCO's monthly retainer at $500. The $500 fee remained in place through subsequent contract extensions until August 31, 2013, at which point Textron terminated the consulting arrangement. In the email sent on August 29 notifying ASASCO that Textron had elected to end the relationship, the company spokesperson stated that Textron was "not aware of any outstanding obligations between the parties."

Each of the consulting contracts between 2005 and 2011 contained a provision stating that the parties agreed that "any and all services rendered by CONSULTANT to the COMPANY shall be deemed to have been given pursuant to this Agreement and no additional payments [other than for approved travel expenses] shall be due to or paid to CONSULTANT." However, the 2011 agreement for the first time contained an expanded version of this no-other-payments statement, providing that the specified compensation was "the exclusive remuneration to be paid by the COMPANY" for "the services provide[d] by CONSULTANT." The 2011 agreement also featured an integration provision:

> This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements or understandings, written or oral. Each party hereby waives the right to assert any claim against the other, its employees, customers or assigns, based on any oral representations, statement, promise or agreement whether made before or after the date of this Agreement.

- 4 -

**B. The Offset Dialogue**

Through the years of their consulting relationship, beginning no later than May 2006,[2] Textron and ASASCO regularly discussed the opportunity for additional compensation to ASASCO through its involvement in offset projects that were an anticipated requirement of the Saudi weapons deal. The record also contains internal Textron emails indicating that ASASCO's anticipated offset activity -- and compensation -- would be independent of the consulting agreement. This correspondence includes a draft "Offset Services Agreement" prepared by Textron in June 2006, an email from Boyamian to Al-Tassan that month stating that Textron was "in the process of getting the Offset Provider Agreement approved," and, on the same day, an internal Textron email asking that "two books" be started for the company's business with ASASCO ("one for a new offset agreement with Asasco, and one for a renewal of the consultant agreement").[3]

Textron and ASASCO never entered into a written offset agreement. Instead, in February 2008, Textron and Blenheim Capital

---

[2] Although Al-Tassan's declaration describes earlier discussions between him and Boyamian on potential offset business, we use this date because it is supported in the record by emails between the two men.

[3] In response to a question concerning the connection between ASASCO's reduced consulting fee and its offset role, Boyamian testified during his deposition that the "consultancy services and offset providing services" were "two separate things."

Partners Limited signed an Offset Services Agreement ("OSA") that permitted but did not require Blenheim to subcontract with ASASCO -- although no other subcontractor could be used without Textron's "prior written consent." Six months later, in an internal email dated September 8, Boyamian told colleagues at Textron that, "Effective September 1st, 2008, [Textron] stopped paying ASASCO the monthly consultancy fee because, [Textron] through Blenheim, an offset service provider company based in UK, has an offset service providing agreement with ASASCO for [Textron] business offset requirements in Saudi Arabia." The email also reported that a two-year renewal of ASASCO's consulting agreement was in the works, "with a nominal monthly fee of $500/month." Boyamian forwarded this email to Al-Tassan.

The Textron-Blenheim-ASASCO association was further formalized in April 2009, when Blenheim and ASASCO entered into a subcontracting agreement under which ASASCO was entitled to 75 percent of the fees paid by Textron to Blenheim under the OSA. The Blenheim-ASASCO contract anticipated that these fees would be deposited into an escrow account, which was to be created "as soon as practicable," and, indeed, ASASCO's right to payment under that contract was contingent on "the full amount of the applicable fee under the Offset Services Agreement being paid to the Escrow Account." Although Textron's agreement with Blenheim did not by its terms provide for an escrow account, Boyamian appeared to

believe that such an account would exist.  In a November 2008 email to Al-Tassan, Boyamian stated his understanding "that Textron will be paying 8% of the contract value to the escrow account for offset."  So far as it appears from the record, no escrow account was ever created.

From the time of Blenheim's appearance on the scene (in 2008) through early 2011, all three businesses -- Textron, ASASCO, and Blenheim -- were involved in discussions about offset projects. Among the later emails exchanged was one sent to Al-Tassan on March 2, 2011 from Steven Cahall of Blenheim, which reviewed the possible fee arrangements among Textron, Blenheim, and ASASCO depending upon whether Textron was required to make offset investments.[4]  The three-way dialogue formally ended in November of that year, however, when Textron sent Blenheim a letter stating that the companies were mutually ending the OSA.[5]  By its

_____

[4] The companies had been discussing the possibility that the offset obligation would be waived for the Textron weapons deal. Cahall's email stated: "If there is an offset obligation then ASASCO MUST INVEST ITS FEES ENTIRELY INTO THE OFFSET PROJECTS.  If there is a waiver of the offset obligation then ASASCO does not have to invest the fees."

[5] The termination letter sent from Textron to Blenheim, dated November 28, 2011, was "[a]greed to and accepted" by Blenheim by means of a signature dated January 12, 2012.  The letter attributed the termination to "recent changes to the offset guidelines in Saudi Arabia."  The letter also stated that "[t]he Offset Services Framework Agreement between [Textron] and [Blenheim], dated January 18, 2011 will remain in force for the duration of its term and will cover all future offset activity for Saudi Arabia."  The parties do not explain this latter agreement in their briefs.

terms, the Blenheim-ASASCO agreement also terminated when the OSA terminated.  ASASCO claims that it was not told, and did not know, that Textron and Blenheim had ended the OSA until September 2013.

**C. The Weapons Deal**

On January 3, 2012, roughly a month after Textron sent Blenheim the termination letter, Boyamian sent Al-Tassan an email reporting that Saudi officials had, on December 24, signed a "Letter of Offer and Acceptance" ("LOA") -- essentially a statement of intent to make a deal -- "as a Christmas gift to us."  Boyamian concluded his message with "CONGRATULATIONS to all of us."  Through 2012, allegedly without knowledge that its subcontract with Blenheim had ended (upon termination of the OSA), ASASCO continued to work with Textron to set up meetings with Saudi government officials.  The correspondence between the two companies included reference to the offset requirement.  In an email to Boyamian in November 2012, Al-Tassan noted an effort to set up a meeting for Textron's chairman with the Saudi Minister of Economy and Planning, who "is also the Head of the Saudi Economic Offset which Textron might want to explore with the minister."

Textron and Saudi Arabia finalized an agreement for the weapons deal in late August 2013.  About a week later, ASASCO received the notification that Textron was terminating their consulting relationship.  In a deposition conducted on December 16, 2015, a Textron representative testified that, as of that date,

the company had not yet reached an offset agreement with the Saudi Arabian government, but he reported that Saudi officials had confirmed that such an agreement was required.[6]

## II.

In its lawsuit, ASASCO claims that, over an extended period of time, it provided essential support at minimal cost for Textron's pursuit of a weapons deal in Saudi Arabia based on assurances from Textron that ASASCO would have a large financial stake in any offset activity related to that deal. When the weapons deal was finally made, ASASCO asserts, Textron backed away from its promises. ASASCO's complaint presented this claim through three theories of liability: (1) breach of contract, specifically the OSA, based on a third-party beneficiary theory; (2) tortious interference with ASASCO's business and contractual relationship with Blenheim; and (3) violations of Chapter 93A, the Massachusetts Deceptive Trade Practices Act, Mass. Gen. Laws Ann. ch. 93A, § 11.

---

[6] Stephen Fogarty, whose job duties at Textron included review of offset agreements, testified as follows:

> [T]here is no question we will have an offset obligation and there will be an offset program.
>
> The only thing that is in question at this moment, is when will this offset agreement be signed, when will this program begin, and what will be the period of performance for this offset program.

When Textron moved to dismiss the complaint, ASASCO sought leave to amend it to address any deficiencies and, possibly, to add new claims, including fraudulent inducement, breach of the covenant of good faith and fair dealing, and tortious interference with prospective business advantage. No discovery had yet taken place. Shortly thereafter, the district court entered an electronic order notifying the parties that (1) it was reserving ruling on the motion to dismiss, (2) it intended to convert that motion into one for summary judgment, and (3) it would permit limited discovery on two issues.[7] Textron later moved for summary judgment and renewed its motion for dismissal, and ASASCO again asked for the opportunity to amend its complaint before the district court's final disposition of the case. ASASCO also sought additional discovery pursuant to Federal Rule of Civil Procedure 56(d), asserting that Textron's motions encompassed issues beyond the scope of the limited discovery the court previously had allowed.

---

[7] The court described the two issues as follows:

> (1) the authenticity of, and plaintiff Arabian Support & Services Company (ASASCO)'s knowledge of, the Termination Letter [from Textron to Blenheim], . . . ; and (2) the authenticity of the [2011-13] Consulting Agreement [between Textron and ASASCO], as well as the preclusive effect, if any, of its terms, particularly with respect to the operation of the integration clause.

- 10 -

In its Memorandum and Order granting summary judgment for Textron, the district court rejected ASASCO's third-party-beneficiary contract theory based on the OSA between Textron and Blenheim because "Textron did all that it was contractually obligated to do." Arabian Support & Servs. Co. v. Textron Sys. Corp., No. 1:15-cv-12951-RGS, 2016 WL 1048868, at *4 n.9 (D. Mass. Mar. 11, 2016). The court also stated that, given the absence of a contractual breach, "there is no viable allegation of tortious interference or violations of Chapter 93A." Id. The court did not address ASASCO's requests for leave to amend or additional discovery.

We review the district court's grant of summary judgment de novo, taking the facts and all reasonable inferences therefrom in the light most favorable to ASASCO as the non-moving party. Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016). "Summary judgment is warranted where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)).

We detect no error in the district court's conclusions on two of ASASCO's three theories of liability. With respect to the contract claim, even if ASASCO was an intended third-party beneficiary of certain provisions of the OSA, Textron did not violate any of the terms of that agreement. As permitted by the contract, Textron and Blenheim ended the OSA by mutual agreement.

- 11 -

In addition, the OSA did not require Textron to pay the fees that were intended to reach ASASCO through Blenheim into an escrow account.[8]  Only the subcontract between Blenheim and ASASCO required the escrow arrangement.  Thus, even if Textron made a payment directly to Blenheim -- as ASASCO alleges and Textron disputes -- Textron would not have violated any contractual provision.  Hence, ASASCO is without a breach on which to hang its third-party-beneficiary contract claim.

Nor do we see a basis for relief from Textron for tortious interference with ASASCO's business or contractual relationship with Blenheim.  ASASCO voluntarily entered into an agreement that expressly made its continued relationship with Blenheim contingent on Textron's voluntary relationship with Blenheim.  In the definitions section of the ASASCO-Blenheim contract, "Termination Date" is defined as "the earlier of [] the date on which the Offset Services Agreement is terminated for any reason," or the date on which termination occurs for other specified reasons.  Moreover, the OSA did not even require Blenheim to hire ASASCO as its offset subcontractor, although Textron secured that relationship by stipulating that no other subcontractor could be hired without Textron's permission.  To say

---

[8] The OSA stated that the fees specified therein "will be paid to the account of BLENHEIM notified to [Textron].  Fees may not be paid to BLENHEIM by way of cash or bearer instrument."

that Textron then improperly interfered in ASASCO's association with Blenheim when it ended the OSA disregards the limited commitments made by the three businesses in the two Blenheim agreements.

Put another way, the harm ASASCO seeks to vindicate is not the elimination of the ASASCO-Blenheim collaboration per se, but the elimination of its own participation in potential offset activity -- as allegedly promised by Textron. The Blenheim-ASASCO agreement was, for a time, the means by which ASASCO was to obtain such involvement. With Textron's termination of the OSA, ASASCO automatically lost its contractual right to offset business via its own agreement with Blenheim -- but ASASCO has not presented a supportable rationale for finding that Textron owed it a duty to protect the ASASCO-Blenheim agreement by maintaining the OSA.

On the other hand, if Textron did promise ASASCO offset-related remuneration, but then terminated the OSA without providing ASASCO an alternative means to obtain it, we see room for a viable Chapter 93A claim premised on Textron's misrepresentations. As we have described, the gist of ASASCO's complaint is that it was induced into providing ongoing consulting services to Textron for both no fee and -- in Boyamian's words -- "a nominal monthly fee" by Textron's assurance of future offset activity and compensation. See Compl. at ¶ 34 (alleging that, after Blenheim "ceased its communications with ASASCO" in 2011,

- 13 -

Textron "assur[ed] ASASCO that its role in the offset arrangement was secure"); ¶ 37 (alleging that, by December 2011 or shortly thereafter, Textron knew that "it did not intend to follow through on its commitment to compensate ASASCO through the [Textron]-Blenheim-ASASCO offset arrangement," yet failed to inform ASASCO and "persisted in its offset-related discussions with ASASCO"); ¶ 44 (alleging that Boyamian promised Al-Tassan that Textron "would 'find another way'" to provide "ASASCO's anticipated offset-related compensation").

Textron points to the integration provision in the 2011 consulting contract as a barrier to any such claim based on verbal representations. However, the clear division that was established early on between ASASCO's consultant role and its future offset role could mean that the integration provision was understood -- or represented by Textron -- to apply to the former but not the latter. Moreover, such a provision does not always bar a misrepresentation claim. See Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 226 (1st Cir. 2003) ("[I]t is well settled in Massachusetts that '[a]n integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation.'" (quoting Starr v. Fordham, 648 N.E.2d 1261, 1268 (Mass. 1995)) (second alteration in original)); Bates v. Southgate, 31 N.E.2d 551, 558 (Mass. 1941) ("[I]t is entirely

- 14 -

possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement."). Particularly where there has been a longstanding "history of performance" between the parties, "reliance on the complained-of duping conduct" could be found reasonable. HSBC Realty Corp. (USA) v. O'Neill, 745 F.3d 564, 573 (1st Cir. 2014).

Hence, the integration clause does not necessarily exclude the Chapter 93Aa claim, and the record contains facts that, depending on the surrounding circumstances, could support an inference of deception. The two actions by which Textron eliminated its connection with ASASCO (first, indirectly, by terminating the OSA and, second, by declining to renew the consulting agreement) coincide with significant developments in Textron's efforts to win the Saudi weapons contract. The end of the OSA overlapped with the signing of the LOA for the weapons deal, and ASASCO's consulting agreement ended right after the weapons deal came to fruition. If Textron knew at the time it signed the 2011 consulting agreement that it would soon end the OSA, but did not tell ASASCO because it wanted to keep the Saudi company on board at a low fee to help finalize the weapons deal, Textron's silence could be found consequential. See, e.g., Incase Inc. v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007) (noting that

- 15 -

"[s]ome cases have held that an act or practice is deceptive 'if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted'" (quoting Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 486 (Mass. 2004))); Lambert v. Fleet Nat'l Bank, 865 N.E.2d 1091, 1098 (Mass. 2007) (observing that "'stringing along' that induces detrimental reliance can, in some cases, constitute a [Chapter] 93A violation"); McEvoy Travel Bureau, Inc. v. Norton Co., 563 N.E.2d 188, 192 (Mass. 1990) ("Massachusetts law clearly states that statements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.").[9]

Such a deliberate failure to disclose the impending termination of the OSA would be even more significant if Textron also was planning by that time to end any relationship with ASASCO as soon as the weapons deal was finalized. Why Textron substantially reduced the consulting fee -- and why ASASCO

---

[9] Textron asserts in its brief on appeal that "ASASCO cannot now claim a right to be paid for separate 'offset services' when it is undisputed that ASASCO never provided any such services." However, ASASCO's contention is that it was denied a promised opportunity to perform offset services. As noted above, Textron's representative reported that "there is no question we will have an offset obligation and there will be an offset program." See supra note 6.

- 16 -

acquiesced to the reduction -- also seem relevant, and potentially revealing, for ASASCO's claim that it was promised offset-related compensation outside of the consulting agreements.[10]  Likewise, the Offset Services Framework Agreement between Textron and Blenheim, which the district court described as "intended to replace the OSA," may have significance, but the court (like the parties on appeal) did not discuss the contents of that contract.  Arabian Support & Servs. Co., 2016 WL 1048868, at *2.

In sum, we disagree with the district court that ASASCO's Chapter 93A claim -- or, indeed, other potential claims resting on alleged misrepresentations by Textron -- necessarily fail because Textron did not breach the OSA.  To the contrary, as described above, ASASCO has identified evidence that raises sufficient doubts concerning Textron's actions and motivations that a violation of Chapter 93A is viable.  We therefore must vacate the summary judgment on that claim and remand the case for further proceedings on the misrepresentation theory.

---

[10] Boyamian testified in deposition that Textron in 2008 sought to eliminate all consultant fees to reduce the company's expenses.  In addition, when asked if ASASCO was "doing a great deal of work for Textron" while it was receiving the $500 monthly stipend, he responded, "I don't think so." By contrast, Al-Tassan, while acknowledging that he signed agreements with the reduced fees, stated that "there were some representations on the other side, so that's why."

Relatedly, the district court denied ASASCO further discovery and the opportunity to amend its complaint in apparent reliance on its view that such efforts would be futile because ASASCO did not have a viable misrepresentation-based claim. In light of this decision, ASASCO should be given the opportunity to amend its complaint to supplement its Chapter 93A claim with any common-law misrepresentation claims supported by the record. See, e.g., Grant v. News Group Bos., Inc., 55 F.3d 1, 5 (1st Cir. 1995) (stating that, "unless there appears to be an adequate reason for the denial [of leave to amend] (e.g., undue delay, bad faith, dilatory motive on the part of the movant, futility of the amendment), we will not affirm the denial"). We leave to the district court the decision whether further discovery is appropriate.[11] We also leave to its discretion whether to allow a renewed motion for summary judgment in light of any new theories presented and the possibility of an expanded record on remand.[12]

---

[11] As Textron points out, the district court did allow some discovery by ASASCO beyond the express limits of the original discovery order. The topics permitted included communications between Textron and ASASCO "regarding changes in any monthly fees paid to ASASCO," and "representations or statements made to Plaintiff to encourage Plaintiff to enter into" the consulting agreements with Textron. Hence, ASASCO already has had some opportunity to obtain evidence related to the alleged misrepresentations.

[12] If the district court allows another round of summary judgment motions on remand, it should also reconsider its order striking parts of the Al-Tassan declaration and specify the portions, if any, it strikes.

<u>Vacated and remanded.</u>  <u>No costs.</u>