# United States Court of Appeals
## For the First Circuit

No. 19-1377

ARABIAN SUPPORT & SERVICES COMPANY, LTD.,

Plaintiff, Appellant,

v.

TEXTRON SYSTEMS CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Martin F. Gaynor III, with whom Haig V. Kalbian, D. Michelle Douglas, William P. McGrath, Jr., Kalbian Hagerty LLP, Nicholas D. Stellakis, and Hunton Andrews Kurth LLP were on brief, for appellant.

John A. Tarantino, with whom Nicole J. Benjamin and Adler Pollock & Sheehan P.C. were on brief, for appellee.

November 20, 2019

**LYNCH**, **Circuit Judge**.  The international arms trade provides the background for this appeal.  Arabian Support & Services Co. ("ASASCO"), a Saudi Arabian consulting company, sued Textron Systems Corporation ("Textron"), a Massachusetts-based defense contractor, on various Massachusetts state law claims. Underlying them all was the assertion that Textron represented that ASASCO's compensation for assisting Textron in securing the sale of sensor fuzed weapons ("SFWs") to Saudi Arabia would include payments resulting from ASASCO's efforts to obtain an "offset waiver" or "offset credits" for Textron associated with that sale. That payment allegedly would be a fee and/or a percentage of the final Textron contract with Saudi Arabia.

ASASCO's 2017 amended complaint asserted violation of Massachusetts General Laws chapter 93A, fraudulent inducement, intentional misrepresentation, negligent misrepresentation, quasi-contract/implied contract/promissory estoppel, and quasi-contract/unjust enrichment/quantum meruit.  We affirm the district court's entry of summary judgment for Textron, relying largely on the district court's able opinion.  Arabian Support & Servs. Co. v. Textron Sys. Corp., 368 F. Supp. 3d 211 (D. Mass. 2019) (Textron II).

                                I.

In recounting the facts, we rely in substantial part on the district court's opinion and our prior decision, Arabian

- 2 -

<u>Support & Services Co.</u> v. <u>Textron Systems Corp.</u>, 855 F.3d 1 (1st Cir. 2017) (<u>Textron I</u>).  We describe the key events over the parties' thirteen-year relationship in chronological order.

A.    <u>Facts</u>

Textron was interested in selling SFWs to Saudi Arabia. The relationship between Textron and ASASCO largely developed through the interactions of Mansour Al-Tassan, ASASCO's President, and Avedis Boyamian, Textron's Director of Middle East Business Development.  Starting in 2001, Al-Tassan and Boyamian discussed various methods of paying ASASCO for its assistance in furthering a SFW sale, including through a fixed monthly fee or through the formation of a joint venture.

In March 2004, Textron engaged the International Law Firm in Riyadh to ensure that its contemplated relationship with ASASCO would be legal under Saudi law.  On July 8, 2004, Robert Kemp, Textron's General Counsel, inquired about the legality of paying ASASCO "on a commission basis."  The International Law Firm advised Kemp on September 1, 2004, that such a relationship had a "significant risk" of being prohibited under Saudi law.

On September 28, 2004, Boyamian and Al-Tassan met in Cairo.  Boyamian told Al-Tassan that Textron was willing to pay ASASCO up to five percent of the value of the SFW deal but that the agreement between the companies must conform to U.S. and Saudi law.  ASASCO alleges that on November 6, 2004, at a meeting in

Saudi Arabia, Boyamian represented to Al-Tassan that Textron would use "offsets"[1] in order to pay ASASCO lawfully for its services if Textron obtained the SFW sales contract with Saudi Arabia.

In 2005, Textron and ASASCO executed the first of what would be five consulting agreements. The first three agreements, each lasting one year during the time period from 2005 to 2008, provided ASASCO with a monthly retainer of $10,000 for its services regarding the sale of Textron's SFWs to the Royal Saudi Air Force.[2]

Throughout 2006, Boyamian and Al-Tassan further discussed the opportunity for ASASCO to receive compensation for

---

[1] Offsets are "the practice by which the award of defense contracts by foreign governments or companies is conditioned upon commitments from the defense contractor to provide some form of compensation to the purchaser." Textron I, 855 F.3d at 2 n.1 (internal quotation marks omitted). An "offset waiver" occurs when the purchaser-country agrees to waive the seller-company's offset obligation. See Textron II, 368 F. Supp. 3d at 218. If a waiver does not occur, the seller-company must perform its offset obligation. The district court noted that Saudi regulations appear to require pre-approval by the Saudi government of the seller-company's plan to fulfill its offset obligation before the signing of a supply contract. Id. An "offset credit" is earned by the seller-company when it develops an offset project, which will be performed in the future, that the purchaser-country determines will satisfy the offset obligation. See id.

[2] All of the consulting agreements also included a provision stating that "any and all services rendered by CONSULTANT to the COMPANY shall be deemed to have been given pursuant to this Agreement and no additional payments [besides approved travel expenses] shall be due to or paid to CONSULTANT. . . . The parties agree that CONSULTANT shall not receive any compensation or commission based in any manner whatsoever on the volume of sales of the COMPANY products and/or services procured or received" under this Agreement.

its assistance with any offset projects.  Textron's position with ASASCO was that "[a]ll such activity must result in Saudi Gov't approval of offset projects, grant credits/or waive requirement."

In June 2006, Textron sent ASASCO a draft offset provider agreement.[3]  Later at deposition, Boyamian described the offset discussions and the consulting agreements as "totally separate." On June 26, 2006, Boyamian also forwarded Al-Tassan internal Textron emails that ordered that ASASCO's business with Textron be recorded separately as "two books" -- one for the proposed offset agreement and one for a renewal of the consultant agreement. Textron and ASASCO never formalized a written offset agreement.

In February 2008, Textron entered into an Offset Services Agreement ("OSA") with Blenheim Capital Partners ("Blenheim"), a company based in the United Kingdom.  If Blenheim helped Textron (1) obtain an irrevocable waiver within six months "after the date of the execution of the Supply Contract" or (2) meet its offset obligations, Textron would pay Blenheim six

---

[3]    Under the draft proposed agreement, which was never executed, ASASCO would have been "entitled to receive a fee of X percent (X%) of the value of an Offset Waiver" provided Textron was satisfied that the offset was waived irrevocably, or to "X percent (X%) of the value of an Offset Credit obtained through successful execution of an Offset Project entered into with ASASCO."

percent of the contract price.[4]  Under the OSA, Blenheim could subcontract with ASASCO, but it needed Textron's written consent to use any other subcontractor.  Boyamian sent Al-Tassan a draft of this agreement in June 2007, before the agreement's finalization.

On June 21, 2007, Al-Tassan, Boyamian, Textron's Offset Manager, and a representative from Blenheim met in Paris.  Al-Tassan asserts that Boyamian represented at this meeting that ASASCO would receive six percent of the Supply Contract under the "offset arrangement."

On September 4, 2008, Textron and ASASCO extended the third consulting agreement, but on a "no-fee basis."[5]  This arrangement lasted until August 31, 2009.

On April 6, 2009, Blenheim and ASASCO finalized a subcontract in which ASASCO would assist Blenheim in securing either an offset waiver or offset credits.  Under the agreement, ASASCO was only entitled to additional compensation if offset

---

[4]     If the final agreement was a government-to-government sale, rather than a contract directly between Textron and the Saudi government, Blenheim would receive two percent.

[5]     Boyamian explained the decision to extend the agreement on a no-fee basis in an email to Textron employees that stated: "Effective September 1st, 2008, [Textron] stopped paying ASASCO the monthly consultancy fee because, [Textron] through Blenheim, an offset service provider company based in UK, has an offset service providing agreement with ASASCO for [Textron] business offset requirements in Saudi Arabia."  The following day, Boyamian forwarded this email to Al-Tassan.

credits or an offset waiver were achieved pursuant to the OSA.[6] In August 2009, Textron and ASASCO entered a fourth consulting agreement effective September 1, 2009, through August 31, 2011, which gave ASASCO a $500 monthly retainer.

In May 2011, Textron's new Director of Business Offsets, Stephen Fogarty, advised Textron to terminate the OSA with Blenheim, describing the six percent fee as "excessive." By this time, Al-Tassan had left Saudi Arabia because a Saudi civil judgment had entered against him and a subsequent civil warrant had issued in June 2010 for his arrest in Saudi Arabia.

While the OSA was still in effect in July 2011, Textron submitted a proposed offset project, developed by ASASCO, to the Saudi Economic Offset Committee. A Saudi official responded the next day rejecting the proposal, stating that it did not align with the Committee's priorities and did not provide sufficient detail.

It is undisputed that, after this rejection, ASASCO never completed another formal offset project proposal for Textron. In the fall of 2011, Textron and Al-Tassan continued to

---

[6] The agreement between Blenheim and ASASCO stated that if Textron paid a fee into "the Escrow Account" pursuant to the OSA, then ASASCO would be entitled to 75% of that fee. (Only the agreement between ASASCO and Blenheim referred to an escrow account -- the OSA did not specify that Textron had to pay the fees into an escrow account.) The agreement would be terminated when the OSA "terminated for any reason."

discuss possible offset projects over email, but no formal proposal ever materialized.

Textron and ASASCO also entered into a fifth consulting agreement, effective September 1, 2011, which contained an integration clause.

In November 2011, Textron sent Blenheim a letter stating that the parties had agreed to mutually terminate the OSA. Blenheim signed the letter on January 12, 2012.[7]

On January 3, 2012, Boyamian emailed Al-Tassan to inform him that the U.S. government and Saudi Arabia had executed a "Letter of Offer and Acceptance," which finalized the terms of the sale of the SFWs, and to offer a "[congratulations] to all of us." No formal contract entered at this time. Through 2012, Textron continued working with ASASCO to set up meetings with Saudi officials. On August 16, 2012, Textron and ASASCO extended the fifth consulting agreement, including its integration clause, through August 31, 2013.

On August 20, 2013, the U.S. Department of Defense announced that Textron had been awarded the contract to provide SFWs to Saudi Arabia for a total price of $640,786,442. The

---

[7] Textron asserts that in February or March 2012, a Textron employee informed Al-Tassan that the OSA had been terminated. ASASCO, however, asserts that Al-Tassan was not informed by Textron until September 2013. Despite this assertion, on May 30, 2012, Al-Tassan emailed his assistant and noted that "Blenheim is out of the picture."

announced contract terms included $89,222,000 for Textron in offset costs. On August 29, 2013, Textron emailed ASASCO that it would not renew the fifth consulting agreement and stated that Textron was "not aware of any outstanding obligations between the parties."

Textron signed a Letter of Agreement ("LOA") with the Saudi Arabian Economic Offset Program on June 9, 2014, agreeing that Textron's offset obligation would be 40% of the SFW contract. The LOA further stated that Textron's commitment of 40% would be included in the "Offset Memorandum of Agreement which will be signed by Textron" and the Economic Offset Program.

By the time of this appeal, Textron and Saudi Arabia had not entered into an Offset Memorandum of Agreement, and Textron had kept the $89.2 million it received for offset costs. Saudi Arabia had not waived the offset requirements. And ASASCO had never delivered an offset project that was approved by Saudi Arabia.

B. Procedural History

ASASCO filed suit against Textron on July 15, 2015, alleging breach of contract, tortious interference, and violation of Massachusetts General Laws chapter 93A. The district court granted summary judgment to Textron on all counts and the First Circuit affirmed as to the breach of contract and tortious

interference counts but vacated the summary judgment as to ASASCO's chapter 93A claim.  Textron I, 855 F.3d at 3.

On June 21, 2017, ASASCO filed an amended complaint making the claims described earlier.  On March 19, 2019, the district court granted Textron's motion for summary judgment on all counts.

## II.

We review the district court's entry of summary judgment de novo.  Town of Westport v. Monsanto Co., 877 F.3d 58, 64 (1st Cir. 2017).  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  As a federal court sitting in diversity, we apply Massachusetts substantive law.  Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 20 (1st Cir. 2017).  We conclude that the district court correctly entered summary judgment for Textron, and we affirm based largely on its analysis.  We add the following additional comments as to several aspects of the appeal.

A.    Mass. Gen. Laws Ch. 93A Claim

ASASCO argues that the district court erred in granting summary judgment to Textron on its chapter 93A claim for two different reasons.  First, ASASCO argues that the district court "misapplied the legal standard" as articulated by the Massachusetts Supreme Judicial Court (SJC) in Kuwaiti Danish

- 10 -

Computer Co. v. Digital Equipment Corp., 781 N.E.2d 787 (Mass. 2003). It says that a case relied on by the district court, Roche v. Royal Bank of Canada, 109 F.3d 820 (1st Cir. 1997), is inconsistent with the SJC's later Kuwaiti Danish decision. ASASCO secondly argues the district court mistakenly concluded that the "core of the misleading conduct" did not occur "primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11. In the circumstances of this appeal, this inquiry is a question of law. Kuwaiti Danish, 781 N.E.2d at 797.

In Kuwaiti Danish, the SJC stated that "a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Id. at 799. ASASCO focuses on the SJC's language that this analysis "should not be based on a test identified by any particular factor" because use of a factor-based test tends "to shift the focus of inquiry away from the purpose and scope of c. 93A." Id.

ASASCO argues that the district court erred when it cited to the factors outlined in this court's earlier decision in Roche. The Roche factors look to where the defendant committed the alleged deception, where the plaintiff was deceived and acted upon the deception, and where the plaintiff was harmed. Roche, 109 F.3d at 829-31. The district court did not apply Roche in a manner

- 11 -

inconsistent with <u>Kuwaiti Danish</u>.  Rather, it carefully considered the nature of each alleged instance of misconduct, as well as the number of alleged instances, in the context of the entire claim and in doing so, performed the "fact intensive" analysis required by the SJC.  <u>Kuwaiti Danish</u>, 781 N.E.2d at 798.  Contrary to ASASCO's argument, the district court did not "narrowly and rigidly construe[] the facts."

Secondly, there was no error when the district court concluded that Massachusetts was not the "center of gravity." ASASCO points to evidence that Textron itself is in Massachusetts and that the email communications to Al-Tassan and ASASCO originated in Massachusetts.  The cases ASASCO relies on are easily distinguished.[8]  Unlike those cases, this case involves alleged

---

[8]    ASASCO relies on three cases where courts have rejected defendants' arguments that the allegedly deceptive conduct in the case did not occur "primarily and substantially within the commonwealth."  These cases are factually dissimilar from the present case.  See <u>Controlled Kinematics, Inc.</u> v. <u>Novanta Corp.</u>, No. 17-cv-11029, 2017 WL 5892200, at *1-3, *5 (D. Mass. Nov. 29, 2017) (denying defendant's motion to dismiss where the allegedly deceptive practices and communications originated in Massachusetts and plaintiff was harmed in California but where plaintiff did not allege that misleading conduct occurred anywhere besides these two locations); <u>Auto Shine Car Wash Sys., Inc.</u> v. <u>Nice 'N Clean Car Wash, Inc.</u>, 792 N.E.2d 682, 686 (Mass. App. Ct. 2003) (concluding that trial judge correctly found that Massachusetts was the center of gravity because both the deception and harm occurred in Massachusetts); <u>Trematerra</u> v. <u>Major League Lacrosse, LLC</u>, No. SUCV201701140BLS2, 2017 WL 6601553, at *1-2, *4 (Mass. Super. Ct. Oct. 13, 2017) (denying defendant's motion to dismiss where defendant's headquarters and the source of the alleged misrepresentations were in Massachusetts but where defendant did

deceptions that occurred almost entirely outside of Massachusetts. ASASCO asserts that it was misled at meetings with Textron officials in Egypt, France, and Saudi Arabia.  We see no error in the district court's analysis.  The chapter 93A, section 11 claims were properly disposed of on summary judgment.

B.   ASASCO's Other Claims

As to ASASCO's claims of error in entry of judgment against its fraudulent inducement, intentional misrepresentation, negligent misrepresentation, and quasi-contract/implied contract/promissory estoppel claims, we affirm the entry of summary judgment based on the district court's reasoning.  A few bedrock principles of Massachusetts contract law require this result.  First, the district court correctly stated that "ASASCO cannot now assert that it reasonably relied on promises of compensation in the form of a commission for assisting in selling the cluster bombs," Textron II, 368 F. Supp. 3d at 227-28, when the terms of all five written consulting agreements flatly prohibited any payment to ASASCO based on commission from the weapons sale.  See Masingill v. EMC Corp., 870 N.E.2d 81, 89 (Mass. 2007) ("It is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract.").

_____

not make any in-person misrepresentations to plaintiff in any other location).

As to ASASCO's alternate claims that, apart from commission, it was entitled to compensation as to offset provisions, the district court correctly concluded that "there is no evidence in the record that Al-Tassan was promised compensation of six percent of the total SFW sale . . . even if ASASCO did not acquire a waiver or offset credits." Textron II, 368 F. Supp. 3d at 228 (emphasis added). The court properly found Textron never represented to ASASCO that ASASCO would receive offset-related compensation even if ASASCO did not secure from the Saudi government an offset waiver or offset credits. Going beyond that, it is undisputed that ASASCO never obtained a waiver or secured Saudi government approval for an offset project, nor did it even complete a formal offset project proposal after the 2011 rejection.

ASASCO reframes its argument in terms that a jury could conclude that Textron denied ASASCO the "opportunity" to provide offset services or secure a waiver, quoting our earlier opinion in Textron I. Textron I, 855 F.3d at 8 n.9. ASASCO argues that because it put forth "several offset proposals that [Textron] could have used once the Supply Contract was signed," the parties "understood and intended that ASASCO would not be able to perform any of those proposals and be paid for them until the Supply Contract was signed," and Textron then declined to extend the consulting agreement once it signed the Supply Contract, Textron deprived ASASCO of this "opportunity."

- 14 -

ASASCO was not denied the "opportunity" to secure offset services. ASASCO's own evidence is that Textron gave it the opportunity to discuss proposed offset projects with Textron. But the Saudi government has never approved any of these offset proposals. Further, ASASCO does not dispute that it failed to come up with any formal offset proposals after its 2011 proposal was rejected by the Saudi government.

The unjust enrichment/quantum meruit claim goes nowhere. Under Massachusetts law, courts generally "will not grant quantum meruit recovery arising from a contingent fee contract where the contingency has not occurred." Liss v. Studeny, 879 N.E.2d 676, 683 (Mass. 2008). Here, the two contingencies were (1) the signing of the Supply Contract and (2) ASASCO's achievement of a waiver or offset credits. The second, necessary contingent event never happened.

Affirmed. Costs are awarded to Textron.