In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 22-2529

THOMAS A. RUSSELL, M.D., *et al.*,

*Plaintiffs-Appellants*,

*v.*

ZIMMER, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:20-cv-00200-TLS-JEM — **Theresa L. Springmann**, *Judge.*

_____

ARGUED FEBRUARY 23, 2023 — DECIDED SEPTEMBER 21, 2023

_____

Before SYKES, *Chief Judge*, AND ROVNER, and LEE, *Circuit Judges*.

ROVNER, *Circuit Judge*. All inventors hope that their inventions will improve the world and be financially successful. Thomas Russell certainly had this wish for his inventions, but when the financial rewards only came trickling in, Russell and others sued the exclusive distributor of his inventions for breach of the clauses in the contract that required the distributor to use commercially reasonable efforts to sell the

products. The district court held, however, that given the terms of the agreement, the plaintiffs had failed to state a viable claim for relief. We affirm.

**I.**

Thomas Russell, M.D., is an orthopedic trauma surgeon who invented numerous products such as bone substitutes and surgical devices to improve outcomes following orthopedic surgery. He, along with Patrick Burke, Gerard Insley, Amanda Kiely, Paul Burke, Thomas Madden, and Aideen Jennings (collectively, Inventors), were shareholders in CelgenTek Innovations Corporation, a medical device firm. According to the Inventors, Russell's creations were game changers in the field of orthopedics.

On October 7, 2015, the Inventors entered into an agreement with Zimmer, Incorporated, a corporation that designs, manufactures, and distributes medical devices. Pursuant to this agreement, Zimmer became the exclusive distributor of certain CelgenTek products.

In November 2015, CelgenTek was experiencing dire financial problems. The Inventors attributed their financial woes to the massive investments, loans, and advances required to fund years of research and development, ensure safety and efficacy, and clear regulatory hurdles. In order to keep CelgenTek solvent, the parties negotiated an agreement in which Zimmer would acquire a 10% ownership of CelgenTek for $2 million, with the Inventors retaining the remaining 90% ownership. After the purchase, CelgenTek's financial position worsened. In February 2016, Zimmer provided CelgenTek with a purchase order for just under $1 million at Russell's request, to help keep CelgenTek afloat.

Zimmer also loaned the company $2 million in April 2016, and in August of that year another approximately $350,000 to meet payroll obligations. The two parties also began discussing potential plans for Zimmer to purchase the remaining 90% of CelgenTek's stock, which it did in late September, 2016.

Under the terms of the September 2016 stock purchase agreement, Zimmer received the remaining 90% of the CelgenTek shares for the purchase price of $17,118,560 with $2,335,320 of that price used to repay loans that Zimmer had previously made to CelgenTek. In addition, according to the agreement, through 2033, the Inventors would retain the right to a small percent of the net yield on the products it developed (the earnout products), of between 1.5% and 6% of net sales, depending on the product.

Pursuant to the agreement, Zimmer agreed that it would use "Commercially Reasonable Efforts" as defined in the agreement to sell the earnout products. R. 56-1 at 19–20. The term "Commercially Reasonable Efforts" is explained in two places in the agreement. Section 2.05(a) defines "Commercially Reasonable Efforts" as follows:

> "Commercially Reasonable Efforts" means, with respect to Buyer's diligence in satisfying an obligation with respect to the Earnout Products, that Buyer applies the level of efforts, expertise and resources that it would apply in the ordinary and usual course of business to satisfaction of a comparable obligation with respect to another product or technology that is similar to the Earnout Products in terms of commercial potential, development stage and product life. In

determining whether Buyer is applying Commercially Reasonable Efforts, (A) the entire business, financial, commercial, scientific, clinical and regulatory context shall be considered, including issues such as product safety and efficacy, the competitive environment, market conditions, the product's proprietary position, the extent to which health care providers would be expected to embrace the product as a desirable and competitive solution, regulatory hurdles, the product's pricing and potential profitability, and similar factors; and (B) decisions and actions with respect to particular Earnout Products are to be evaluated in the context of the business, operations and product portfolio of Buyer and its Affiliates (which may result in decisions and actions that differ from those that the Company Entities have taken historically (or would, but for the Transactions, take prospectively) with respect to the Earnout Products).

R. 56-1 at 19.

In section 2.05(e), the agreement explains Zimmer's obligation to use "Commercially Reasonable Efforts" in the following way:

*Commercially Reasonable Efforts*. Following the Closing Date, Buyer shall use Commercially Reasonable Efforts, directly and/or indirectly through its Affiliates and any licensees, to sell the Earnout Products during each Earnout Quarter, but such obligation shall not be construed to create any fiduciary or similar

relationship between Buyer or any of its Affiliates, on one hand, and Sellers or the Seller Representative, on the other hand. Sellers acknowledge that Buyer and its Affiliates shall have the right to operate their businesses in accordance with their own commercially reasonable discretion and Buyer is under no obligation to provide any specific level of investment or financial assistance to the Company Entities. Sellers further acknowledge that the payment of any Earnout Payments is speculative and subject to, among other things, the future performance of the Company Entities, which cannot be predicted with accuracy. Accordingly, Buyer makes no representations, warranties, covenants or guaranties as to the future performance of the Company Entities or the likelihood of any Earnout Payments.

R. 56-1 at 20.

From the date the agreement was executed, until December 31, 2019, Zimmer paid the Inventors approximately $130,000 in earnout payments. The Inventors, however, believed that if Zimmer had used commercially reasonable efforts to sell the Earnout Products, those products would have earned earnout payments in the millions. The Inventors alleged specifically that Zimmer:

a) Failed to retain the members of the CelgenTek commercial team involved in market development in Europe;

b) Failed to engage with the CelgenTek Medical Advisory Boards in Europe and North America;

c) Sent a field notification to customers stating that the product supply was to be terminated based on "strictly a business decision;"

d) Terminated the clinical trial at the Leeds, United Kingdom, General Infirmary;

e) Failed to initiate a global clinical trial in hip fractures with Professor Mohit Bhandari as promised by Randy Sessler;

f) Allowed the CE Mark regulatory approval for the N-Force products and the iN3 Cement to expire;

g) Terminated key individuals who were involved with and were knowledgeable about the product;

h) Ceased N-Force product manufacturing activity at the Memphis facility;

i) Terminated the Supply and Exclusive Distribution Agreement with Innotere GmbH in Radebeul, Germany, for calcium phosphate paste;

j) Failed to transfer the manufacturing of the iN3 cement from CelgenTek Shannon to any Zimmer Biomet facility;

k) Failed to secure manufacturing capability for the N-Force Fixation System by dismantling all equipment and facilities and regulatory approvals;

l) Failed to meet customer orders in Europe;

m) Removed instrumentation sets for N-Force Fixation System application from customer locations;

n) Failed to commercialize the product in Australia despite the fact that the product was registered and granted reimbursement status in Australia in 2016;

o) Failed to ship the products to Australia despite multiple staff training and registration fees;

p) Failed to support new European sales with existing and new customers despite multiple product training sessions;

q) Failed to develop and provide appropriate marketing materials, strategy or sales incentive programs;

r) Failed to schedule promised leadership team meetings to discuss developments with the N-Force Fixation System e.g., integration of the technology to the A.L.P.S. plating system;

s) Failed to make a good faith effort to commercialize the Russell Frame technology;

t) Failed to schedule promised leadership team meetings to discuss developments with the N-Force Fixation System and the iN3 cement; and

u) Terminated meaningful communication with Plaintiffs regarding the Earnout Products.

R. 56 at 13–14.

The Inventors invoked diversity jurisdiction (Russell is from Tennessee and the other plaintiffs from Ireland) to sue Zimmer (a Delaware corporation headquartered in Indiana) in the United States District Court for the Western District of Tennessee, alleging claims of fraudulent inducement, breach of contract, breach of implied covenant of good faith and fair dealing, and declaratory judgment. Although the Inventors sued in Tennessee, the agreement included a forum selection clause which required the parties to assert any claims in Indiana. Consequently, on May 18, 2020, the district court in the Western District of Tennessee granted Zimmer's motion to transfer the case to the Northern District of Indiana.

Once there, the district court granted the Inventors' unopposed motion to amend the complaint. The Inventors' amended complaint set forth a single claim for breach of contract, claiming that Zimmer failed to use commercially reasonable efforts to sell the earnout products, and reserving for trial the determination of damages. The Inventors alleged that Zimmer failed to fulfill its obligations in order to "protect its existing business segments and prevent[] access to the technology by other medical device companies." R. 56 at 17. Zimmer filed a motion to dismiss, which the district court granted, and we now review de novo. *See Stant USA Corp. v. Factory Mut. Ins. Co.*, 61 F.4th 524, 525 (7th Cir. 2023).

## II.

### A. Breach of the stock purchase agreement

To thwart Zimmer's motion to dismiss, the Inventors must show that they have stated a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). And in this case, that means that the Inventors must have alleged a plausible claim that Zimmer breached the agreement by failing to use commercially reasonable efforts to sell the earnout products. In evaluating whether the Inventors have successfully made such a claim, we construe their complaint in the light most favorable to them, accepting their factual allegations as true and drawing all reasonable inferences in their favor. *See Burke v. Boeing Co.*, 42 F.4th 716, 723 (7th Cir. 2022).

The Inventors argue that the complaint's list of twenty-one actions that Zimmer either took or failed to take more than sufficiently sets forth a claim that Zimmer breached the agreement by failing to use commercially reasonable efforts. According to Zimmer, on the other hand, the Inventors have failed to demonstrate any breach at all, as their complaint merely second guesses business decisions that Zimmer was entitled to make under the terms of the agreement.

Under Indiana law, a plaintiff alleging a breach of contract must show the existence of a contract, a breach, and damages. *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021). Of course, the essence of the breach claim in this case is whether the defendants used commercially reasonable efforts to sell the earnout products. As set forth above, commercially reasonable efforts means that Zimmer must "appl[y] the level of efforts, expertise and resources that it would apply in the ordinary and usual course of business to satisfaction of a comparable

obligation with respect to another product or technology that is similar to the Earnout Products in terms of commercial potential, development stage and product life." R. 56-1 at 19. This evaluation is done holistically, looking at "the entire business, financial, commercial, scientific, clinical and regulatory context … including issues such as product safety and efficacy, the competitive environment, market conditions, the product's proprietary position, the extent to which health care providers would be expected to embrace the product as a desirable and competitive solution, regulatory hurdles, the product's pricing and potential profitability, and similar factors." R.56-1 at 19.

In other words, to analyze whether Zimmer was using commercially reasonable measures, one would have to look to Zimmer's diligence in selling the earnout products against its diligence in selling other similar products or technology in the course of its regular business operations. In doing so, the agreement requires that such an assessment considers all the factors that might affect how Zimmer conducts business—regulatory, market, profitability, et cetera.

The district court described this comparison as an "'inward facing definition' of 'commercially reasonable efforts', namely one that 'applies the buyer's own standard for undertaking … sales and marketing efforts.'" D. Ct. Op. at 8 (*citing* Kristian Werling et al., *"Commercially Reasonable Efforts" Diligence Obligations in Life Science M&A*, 18 No. 6 M & A Lawyer 16 (2014); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 941, 946–47 (N.D. Cal. 2014)). The district court contrasted that with the more objective "outward facing" definition of commercially reasonable efforts—one that compares a buyer's efforts to industry standards or to those of other similarly situated

businesses. *Id.* (*citing Neurvana Med., LLC v. Balt USA, LLC.*, No. 2019-0034, 2020 WL 949917, at *16 (Del. Ch. Feb. 27, 2020)). Agreements that look to the buyers' own practices are inherently more friendly to the buyer, as the only standard of comparison is the buyer's subjective intent, as opposed to an objective industry standard. Of course, the Inventors could have bargained for either type of standard.

The Inventors argue that the discussion of "inward" and "outward" facing agreements came late to the game in this litigation—raised in the defendant's reply brief following its motion to dismiss. But whatever label we put to it, the question as to what entity or entities a court must look to for comparison was, from the beginning, central to and part of determining whether Zimmer undertook commercially reasonable efforts. And it is clear from the plain language that the agreement contemplated that commercially reasonable efforts would be evaluated by looking to Zimmer's own business practices. *See Hartman v. BigInch Fabricators & Constr. Holding Co., Inc.*, 161 N.E.3d 1218, 1223 (Ind. 2021) (noting that when a contract is unambiguous a court must apply the plain and ordinary meaning of the language).

The agreement emphasizes several times that it is Zimmer's ordinary commercial practices to which we must look. It requires that we look at the "level of efforts, expertise and resources that *it* [Zimmer] would apply in the ordinary and usual course of business." R. 56-1 at 19 (emphasis added). And "decisions and actions with respect to particular Earnout Products are to be evaluated in the context of the business, operations and product portfolio of Buyer [Zimmer] and its Affiliates." R. 56-1 at 19. The agreement makes clear that Zimmer "shall have the right to operate their business in

accordance with *their own* commercially reasonable discretion." R. 56-1 at 20 (emphasis added). And it notes that the decisions made by Zimmer "may result in decisions and actions that differ from those that the [CelgenTek] Entities have taken historically" or would take in the future if they still owned the rights to the products. R. 56-1 at 19. In short, everything in the agreement demands that we look not at what CelgenTek may have done, or what the standard is in the industry, but rather those efforts that Zimmer would use in its own course of business.

It is also important to note what the agreement does not do. It does not create a fiduciary relationship between Zimmer and the Inventors. It does not require Zimmer to provide any level of investment or financial assistance to the Inventors. It does not promise any particular amount of payment, but rather emphasizes that earnout payments are "speculative and subject to, among other things, the future performance of the [CelgenTek] Entities, which cannot be predicted with accuracy." R. 56-1 at 20. And it "makes no representations, warranties, covenants or guaranties as to the future performance of the [CelgenTek] Entities or the likelihood of any Earnout Payments." R. 56-1 at 20.

The Inventors argue that the district court erred by subjecting them to far more rigorous pleading requirements than the Federal Rules of Civil Procedure require for notice pleading. Rule 8, they note, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Inventors are correct that they need only show through their allegations "that it is plausible, rather than merely speculative, that [they are] entitled to relief." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664 (7th Cir.

2022). And they need have just enough details about the subject matter of the case to present a story that holds together. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). This low bar asks that plaintiffs allege "'only enough facts' to 'nudge[ ] their claims across the line from conceivable to plausible.'" *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 551 (7th Cir. 2023) (*quoting Twombly*, 550 U.S. at 570). As the Inventors see it, they provided a seventeen-page, sixty-seven-paragraph pleading with twenty-one examples of actions that Zimmer failed to take to sell the earnout products. They pointed out the specific provisions of the agreement that they allege Zimmer breached, and even provided a motive. "This should have been more than enough," they conclude. Inventors' Brief at 14. For a motion to dismiss, however, the key is not the quantity of the allegations or even the level of specificity of them—because, of course, only a short plain statement is required. What matters instead is how well the "pegs" of the factual allegations fit the "holes" of the legal theory.

In this case, even taking all the Inventors' allegations as true, none of those allegations states a claim either alone or in the aggregate for a violation of the duty to use commercially reasonable efforts to sell the earnout products as defined by *this* agreement. Notably, and most importantly, none of these twenty-one complained of actions and inactions compares the earnout products to a "comparable obligation with respect to another product or technology that is similar to the Earnout Products in terms of commercial potential, development stage and product life." R. 56-1 at 19. In other words, there are no allegations that Zimmer deviated from its usual standard of conduct. In addition, none of those twenty-one items evaluates the earnout products in the context of "the entire

business, financial, commercial, scientific, clinical and regulatory" milieu. R. 56-1 at 19.

The Inventors argue that the commercially reasonable standard is a fact-intensive one that cannot be resolved on a motion to dismiss. *See Twombly*, 550 U.S. 544 at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."); *Swanson*, 614 F.3d at 404 ("'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not."). But uncovering the truth or falsity of the Inventors' allegations would not alter our assessment of whether the Inventors had stated a claim on which relief can be granted.

Many of the twenty-one items are part of a wish list of how the Inventors hoped Zimmer would have marketed and sold the earnout products, or a list of what the Inventors would have done had they not put Zimmer in charge of sales. Others allege broken promises that Zimmer purportedly made before the signing of the agreement and thus would not be actionable due to the agreement's integration clause. The plain language of the agreement makes clear that these types of allegations cannot support a claim for breach of contract.

## B. Motion for leave to amend the complaint

While opposing Zimmer's motion to dismiss, the Inventors argued in the alternative that the district court should allow them to amend the pleading once again to identify "additional ways in which Zimmer failed to use 'commercially reasonable efforts' to market and sell the technology." R. 65 at 24. The Inventors argued that Zimmer would not be prejudiced as it had not yet answered the pleading, disclosures had

not yet been served, and discovery had not yet begun. But the district court denied the motion to amend, reasoning that the Inventors had already had a second opportunity to allege facts sufficient to state a claim for breach of contract, and, more importantly, because they had not shown that any amendment would not be futile. D. Ct. Op. at 16.

It is true, as the Inventors state, that a court should freely grant a leave to amend a pleading when justice requires. Fed. R. Civ. P. 15(a)(2). District courts, however, have broad discretion to deny leave to amend a complaint where the amendment would be futile. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 582 (7th Cir. 2019). And although we review the denial of a motion to amend for abuse of discretion, we look de novo at the legal basis for the futility. *Nowlin v. Pritzker*, 34 F.4th 629, 635 (7th Cir. 2022).

The Inventors argue that they could offer additional and more detailed ways in which Zimmer failed to use commercially reasonable efforts, but as we explained above, stating a plausible claim for relief depends not on the quantity of the allegations, but rather on the quality of the fit between the allegations and the legal theory. The Inventors have proposed only general statements that they could offer additional ways in which Zimmer failed to use commercially reasonable efforts but have never explained what factual detail they could have added or why they did not include that detail in the original complaint. Of course, the complaint itself need only have "a short and plain statement of the claim showing that the pleader is entitled to relief," (Fed. R. Civ. P. 8(a)(2)), but after two tries, the district court did not abuse its discretion in denying the motion to amend where the plaintiffs gave no indication as to how the third try would resolve the

insufficiencies in the complaint. *See Nowlin*, 34 F.4th at 636 (noting that it was not an abuse of discretion for the district court to refuse to allow an amendment of the complaint where the plaintiffs had shown no indication that they were able to cure the deficiencies of their complaint). Nor do we see, upon our de novo review of futility, any demonstration that this undefined additional evidence would make the complaint viable. Finally, the district court reasonably determined that Zimmer would be prejudiced by having to defend against another complaint given the time and resources already spent in responding to the first two.

The Inventors' complaint did not state a plausible claim that Zimmer failed to use commercially reasonable efforts to sell the earnout products, and the district court did not abuse its discretion in denying the motion to amend the complaint a second time. Consequently, we AFFIRM the decision of the district court in all respects.