Alere, Inc. acquired all outstanding shares of TwistDx, Inc., in 2010 and merged it with a wholly-owned subsidiary. TwistDx, which was based in the United Kingdom, was working on ways to use Recombinase Polymerase Amplification (“RPA”) technology to detect pathogens that cause human diseases.
Alere paid TwistDx’s stockholders (the “Shareholders”) $35 million at the closing. It also agreed to make further earnout payments, capped at $125 million, contingent on TwistDx meeting product development or revenue targets. Alere paid the Shareholders $25 million of this contingent earnout compensation, consisting of $20 million in product milestone payments plus $5 million based on 50/50 sharing of revenue from the licensing of Non-IVD Products.[1] The Shareholders did not receive any other earnout payments. Abbott Laboratories acquired Alere in October 2017; it decided to discontinue funding for TwistDx and shut it down in May 2018.
The Shareholders contend that Alere unlawfully deprived them of the opportunity to earn the remaining contingent payments. The Shareholders have sued Alere and the subsidiary through which the 2010 merger took place; the Court will refer to Alere and Innovacon, Inc., collectively as “Alere.”
The Shareholders claim that Alere breached its express contractual obligations under the parties’ Merger Agreement, breached the implied covenant of good faith and fair dealing, and violated G.L. c. 93A, § 11, by engaging in unfair or deceptive acts or practices. The Court will allow Alere’s motion for summary judgment on all three claims for the reasons discussed below.
 
--------------------------------------------
 
[1]        “Non-IVD Products” is defined in the Merger Agreement to mean products using RPA technology for applications other than human in vitro diagnostics, i.e. for uses other than testing human biological samples outside one’s body.
 
                                                            -1-
 
1. Breach of Contract. Alere is entitled to summary judgment on count I because the Shareholders have not mustered evidence sufficient to prove that Alere violated the express terms of the Merger Agreement. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991) (“If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.”) (quoting Celotex Corp. v. Catret, 477 U.S. 317, 328 (1986) [White, J., concurring]).
To prove this claim for breach of contract, the Shareholders must demonstrate that the Merger Agreement was contractually binding (which is undisputed), Alere “committed a breach of that contract,” and the Shareholders “suffered harm as a result.” See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) (elements of breach of contract claim).
Most aspects of the Shareholders’ claim for breach of contract are based on misreadings of the plain language of the Merger Agreement, and the others are unsupported by evidence. Since the Shareholders cannot prove any breach of contract, the Court need not address whether the Shareholders have evidence that the claimed breaches caused them to suffer what would be compensable injury. “A nonmoving party’s failure to establish an essential element of her claim ‘renders all other facts immaterial’ and mandates summary judgment in favor of the moving party.” Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012), quoting Kourouvacilis, supra, at 711.
The Merger Agreement provides that the contract and any issue as to “the rights and obligations of the parties” shall be governed by Massachusetts law.
The Court finds that all relevant provisions of the Merger Agreement are unambiguous when considering the contract as a whole, and that their meaning is therefore a question of law that the Court may decide on a summary judgment motion. See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002); Trustees of Beechwood Village Condominium Trust v. USAlliance Federal Credit Union, 95 Mass. App. Ct. 278, 284–285 (2019). “Whether a contract is ambiguous is also a question of law.” Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007). Even if contract language is hard to parse, that does not make it ambiguous. See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006). That the parties disagree about how to read the Merger Agreement does not make it ambiguous either. “[A]mbiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s.” Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795
 
                                                            -2-
 
(2010) (affirming summary judgment), quoting Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999).
1.1. No Duty to Develop an RPA Instrument. The Shareholders contend that Alere breached a purported contractual duty to develop “the diagnostic instrument that would incorporate the RPA technology.” In other words, they assert that TwistDx was responsible only for developing biochemical methods for using RPA to detect any or all of the pathogens specified in the Merger Agreement, and that Alere was contractually obligated to use other resources to develop “an instrumented, diagnostic device” that would use this technology “to detect the presence of these targeted diseases in humans.”
This part of the contract claim fails because nothing in the Merger Agreement required Alere to develop an RPA instrument or device for its new subsidiary, or permitted TwistDx to sit back and wait for Alere to do so on its behalf. The Shareholders concede, as they must, that “the contract is silent on this point.”
The Court may not read into the Merger Agreement a new requirement that Alere develop an RPA instrument using resources outside of TwistDx.[2] The Court “cannot rewrite the contract to cure an oversight or relieve a party from the consequences” of the contract’s “plain terms.” Automile Holdings, LLC v. McGovern, 483 Mass. 797, 817 (2020), quoting National Med. Care, Inc. v. Zigelbaum, 18 Mass. App. Ct. 570, 575–576 (1984).
Though the Shareholders may regret not having convinced Alere to include such a requirement, they are bound by the plain and unambiguous language of the Merger Agreement, which “must be enforced according to its terms.” See A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 479 Mass. 419, 428 (2018), quoting Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).
“Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.” Acushnet Company v. Beam, Inc., 92 Mass. App. Ct. 687, 695 (2018), quoting Vermont  Teddy  Bear Co. v. 438 Madison Realty Co.,        1 N.Y.3d 470, 475 (2004). That is essentially what the Shareholders are asking the Court to do.
 
--------------------------------------------
 
[2] Though Alere insists that it did develop a workable RPA instrument, that is in dispute. Therefore, for the purpose of deciding Alere’s summary judgment motion, the Court must assume that Alere never designed an adequate device.
 
                                                            -3-
 
The Merger Agreement reflects the parties’ recognition that use of RPA technology to detect pathogens could not be commercially successful without a physical device that would implement the technology. But nowhere does the contract assign to Alere responsibility for developing such a device. Schedule 7.10(c) describes in general terms the qualities that such a device should have. The parties amended the Merger Agreement in April 2014 to incorporate the language from this schedule into § 7.10(c) of the contract. Section 7.10(c), even as amended, says (in relevant part) only that Alere could consider whether TwistDx had developed new products that were incorporated into a device with the desired qualities when deciding “whether to seek regulatory approval or clearance for, or to initiate commercial sales of,” any such product. Neither § 7.10©, nor the related Schedule, nor anything else in the Merger Agreement imposed on Alere any obligation to develop such a device for TwistDx.
The Shareholders insist that they “understood” all along that “the development of the instrument to use RPA to detect diseases … was Alere’s responsibility.” And they argue that this makes good sense because TwistDx “was a research- based organization without any instrumentation experience,” while its acquirer Alere had “substantial experience as a medical diagnostic instrument developer and manufacturer.”
This argument misses the point.
A contracting party’s subjective understanding of what they thought their agreement provided cannot trump the plain meaning of unambiguous written contract terms. See, e.g., Eigerman, 450 Mass. at 288 n.8 (parties’ alleged “practical understanding” of how their agreement “would actually work” cannot trump unambiguous contract language); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 147 n.9 (2007) (parties’ subjective understanding of contract terms cannot create ambiguity); Herson v. New Boston Garden Corp.,  40 Mass. App. Ct. 779, 791–792 (1996) (parties’ “personal understanding” of contract meaning “irrelevant” in deciding whether contract is ambiguous).
The Shareholders and Alere are sophisticated parties that “choose to embody their agreement in a carefully crafted document,” and must be “held to the language they chose.” Fronk v. Fowler, 71 Mass. App. Ct. 502, 508 (2008), quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 819 (2004). “There is no ambiguity here that would allow a court to search for an intent of the parties not to be held strictly to the plain terms of the contract language.” A.L. Prime, 479 Mass. at 431–432, quoting Eigerman, 450 Mass. at 287. “[S]ophisticated parties are bound
 
                                                            -4-
 
by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court’s role is to enforce the agreement as written.” Glaxo Grp. Ltd. v. DRIT LP, 248 A.3d 911, 919 (Del. 2021). “Parties have a right to enter into good and bad contracts; the law enforces both.” Id., quoting Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010).
1.2. Commercially Reasonable Efforts to Assist TwistDx. More generally, the Shareholders have not mustered evidence sufficient to create any triable issue about whether Alere breached its obligation under § 7.10(c) of the Merger Agreement to use “commercially reasonable efforts” to assist TwistDx in developing and seeking regulatory approval of products that would use RPA technology to detect certain specified pathogens.[3]
Section 7.10(c) established an inward-facing standard for determining what would constitute “commercially reasonable efforts.” This provision required Alere to “apply[] funds, personnel and resources” to assist TwistDx’s product development efforts “in a manner consistent with the efforts of [Alere] and its Affiliates with respect to products … of similar market potential” as those being developed by TwistDx.
TwistDx has mustered no evidence showing or supporting an inference that Alere failed to provide TwistDx with a level of support comparable to what Alere provided to other subsidiaries or business units that were working to develop products of similar market potential.
Though TwistDx commissioned an expert report about support provided by Alere, the expert (Alan Donald) used the wrong comparator. Mr. Donald says that he was asked to assess the extent to which Alere … adhered to industry norms and practices concerning the post-acquisition development and commercialization of TwistDx, Inc.’s RPA technology” (emphasis added). Applying that yardstick, Donald concluded that Alere “failed to engage in the level of commercial and developmental effort typically provided in the industry under similar acquisition terms” (emphasis added).
 
--------------------------------------------
 
[3] The Court previously dismissed Plaintiff’s claim for breach of an implied obligation to use reasonable efforts because count I alleges that Alere violated its express contractual obligation to use “commercially reasonable efforts,” and “[t]he law will not imply a contract” or a contractual right where an “express agreement or covenant” already addresses the same subject matter. Kennedy v. B.A. Bardetto, Inc., 306 Mass. 212, 216 (1940); accord, e.g., Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956).
 
                                                            -5-
 
Donald’s expert opinions are irrelevant because Alere had no contractual obligation to follow “industry norms and practices” or to provide the level of effort or support “typically provided in the industry.”
Parties to a merger agreement that require the purchaser to exercise “commercially reasonable efforts” to develop the seller’s products are free to, and often do, adopt an “outward facing” obligation that “requires the buyer to use the same level of effort that similar industry participants would use for similar products under similar circumstances.” Johnson & Johnson v. Forits Advisors, LLC, 2026 WL 89452, at *23 n.171 (Del. Jan. 12. 2026).
But comparisons to industry norms are not relevant where, as here, the parties instead adopt an “inward facing” standard that requires the buyer “to use a level of effort that the buyer would use in developing, marketing or selling its own similar products.” Russell v. Zimmer, Inc., 82 F.4th 564, 569–571 (7th Cir. 2023) (affirming dismissal where earnout provisions imposed inward-facing commercial reasonableness requirements, and facts alleged in complaint did not plausibly suggest any violation of that standard). “Typically, an ‘inward- facing’ obligation is more buyer-friendly as the buyer’s efforts are measured against its own past practice in similar situations,” and not against what other companies have done. Fortis Advisors, supra; accord Russell, 82 F.4th at 570.
Alere is entitled to summary judgment on this aspect of the contract claim because the Shareholders have mustered no evidence that Alere provided less support to TwistDx than Alere did for other comparable products. See Terumo Americas Holding, Inc. v. Tureski, 251 F.Supp.3d 317, 327–328 (D. Mass. 2017) (Casper, J.) (granting summary judgment on claim for breach of similar inward- facing efforts standard); Banas v. Volcano Corp., 47 F.Supp.3d 941, 947 (N.D. Cal. 2014) (same). The Shareholders’ evidence about whether Alere lived up to “industry norms” does not suffice because it is not relevant.
1.3. The Limited Autonomy Provision. The Shareholder’s claim that TwistDx had a contractual right to absolute and unfettered autonomy to make all decisions about its product design and development, and that Alere breached this contract provision by imposing limits on product development options, is based on another misreading of the Merger Agreement.
Like the “commercially reasonable efforts” provision in § 7.10(c) discussed above, the “autonomy” provision in § 7.10(b) is also inward-looking. Section 7.10(b) provides that TwistDx’s management “will have autonomy in the
 
                                                            -6-
 
operation of [TwistDx] generally consistent with that provided to management of other similar operating units of [Alere] and its affiliates” (emphasis added). It also states that TwistDx management “will be entitled to make all decisions on day-to-day operations” as well as “product design and development,” provided that, such activities are consistent with [TwistDx’s] budget and the applicable polices and procedures of [Alere]” (emphasis added).
In other words, the autonomy granted to TwistDx was limited, not absolute as the Shareholders now claim. Alere had no obligation to grant TwistDx any more autonomy than it granted to “similar operating units.” And, by contract, Alere retained the right to limit TwistDx’s product design and development efforts to keep them within budget and to make sure that they were consistent with overall company policies, including with respect to what instruments or devices Alere wished to develop.
The Shareholders point to no evidence that the limits on product design and development decisions of which they complain were inconsistent with the level of autonomy granted to similar operating units. Nor have they shown that these limits were not the result of budget or policy constraints. Since the Shareholders cannot muster the evidence needed to prove this aspect of their contract claim, Alere is entitled to summary judgment in its favor.
1.4. Pursuit of Non-IVD Opportunities. The Shareholders have also not mustered evidence sufficient to create any triable issue about whether Alere breached its obligation under § 7.10(d) of the Merger Agreement “to identify and pursue commercially reasonable opportunities for transactions with Third Parties in fields other than human in vitro diagnostics.”
This provision required that Alere retain “one or more employees or consultants” to pursue such non-IVD opportunities. It is undisputed that Alere complied with this aspect of § 7.10(d) by hiring a new TwistDx employee to develop licensing opportunities for the RPA technology, and by assigning a member of Alere’s business development staff to pursue non-IVD licensing opportunities for TwistDx.
Section 7.10(d) also required Alere to “use commercially reasonable efforts to exploit” any identified opportunities to earn Non-IVD Revenues. It is undisputed that Alere made such efforts and met with some success,
 
                                                            -7-
 
generating $10 million in non-IVD licensing fees, half of which was paid to the Shareholders as “contingent merger consideration” in accord with the contract.
The fact that Alere did not succeed in striking more non-IVD licensing deals for TwistDx’s RPA technology would not support a reasonable inference that Alere failed to make commercially reasonable efforts to do so. The Shareholders’ conclusory assertion that some unspecified part of a 2017 valuation report proves this point is unavailing; the Shareholders provide no reasoned explanation as to how this valuation report shows that Alere failed to make commercially reasonable efforts to generate more Non-IVD revenues.
In sum, Alere is entitled to summary judgment on this part of the breach of contract claim because no reasonable jury, presented with the evidence in the summary judgment record, could find that Alere breached its obligations under § 7.10(d) of the Merger Agreement.
1.5. Terminating TwistDx’s New Product Development. The Shareholders also claim that Alere’s “decision to terminate TwistDx’s New Product Development efforts in 2018, before the end of the earnout period, was not permitted by the Merger Agreement.” That is incorrect.
Section 7.10(a) of the Merger Agreement originally provided that Alere would provide TwistDx with operating budgets for 2010, 2011, 2012, and 2013 that met certain criteria. This provision was amended in 2014 to provide that Alere and management of TwistDx would also agree on a commercially reasonable operating plan and budget for TwistDx for calendar years 2014, 2015, and 2016.
Nothing in § 7.10(a) required that Alere continue to fund TwistDx operations after 2016.
To the contrary, this section reserved for Alere broad discretion to stop funding TwistDx’s product development efforts at any time if they were no longer promising. Section 7.10(a) states that Alere “shall not be obligated to maintain or increase funding” for TwistDx “to the extent that [Alere] shall reasonably and in good faith conclude, after consultation with management of [TwistDx], that, due to unforeseen technical obstacles, changes in regulation or market requirements or other changes in circumstances, it is no longer commercially reasonably to continue to invest in one or more Company Products or New Company Products.” This provision means what it says. Alere retained the discretion to exercise its business judgment about whether continuing to invest
 
                                                            -8-
 
in product development by TwistDx made commercial sense, and to terminate those efforts if continuing to fund them was not commercially reasonable.
Abbott Laboratories completed its acquisition of Alere on October 3, 2017.[4] It is undisputed that thereafter Abbott representatives met with TwistDx leadership in the United Kingdom in December 2017 to discuss their efforts to commercialize TwistDx’s RPA technology. It is also undisputed that Dr. Niall Armes—who was CEO of TwistDx before it was acquired by Alere, and continued to run its operations thereafter—corresponded with Abbott personnel about TwistDx and its product development, starting when Abbott acquired Alere in October 2017 and continuing through May 2018. Following its project evaluation, Abbott decided to discontinue funding for TwistDx projects; in May 2018 it shut down the U.K. facility and terminated Dr. Armes’ employment.
The Shareholders may disagree with Abbott’s exercise of its business judgment to discontinue work on TwistDx product development as of May 2018. But § 7.10(a) of the Merger Agreement gave Alere—by then a wholly-owned subsidiary of Abbott—the discretion to do just that, based on its evaluation of whether it was commercially reasonable to continue to invest in TwistDx.[5]
2. Breach of Implied Covenant. Alere is also entitled to summary judgment on count II, because the Shareholders have been unable to muster evidence sufficient to prove that Alere violated the implied covenant of good faith and fair dealing that is part of the Merger Agreement.
Every contract includes an implied covenant of good faith and fair dealing, which provides “that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014), quoting Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976).
 
--------------------------------------------
 
[4] See Ex.26, Jeffrey Haas depo., at 21 & 42.
[5] The Shareholders’ argument that the separate “sole discretion” provision in
§ 7.10(c) did not give Alere the right “to cut-off development efforts with nearly two years to run in the earnout period” is technically correct, but not relevant. Alere had that right under a different provision, § 7.10(a), both in its original form and as amended in 2014 by § 1.8 of the Second Amendment to Agreement and Plan of Merger.
 
                                                            -9-
 
“The scope of the covenant is only as broad as the contract that governs the particular relationship.” Wortis v. Trustees of Tufts College, 493 Mass. 648, 671 (2024), quoting Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005). This implied covenant “does not create rights or duties beyond those the parties agreed to when they entered into the contract.” Boston Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs., 463 Mass. 447, 460 (2012), quoting Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 680 (2011). Instead, it governs only “the manner in which existing contractual duties are performed.” Eigerman, 450 Mass. at 289.
The Shareholders contend in their written memorandum that Alere breached the implied covenant in two related but logically distinct ways. Neither aspect of this claim can survive summary judgment.[6]
2.1. BARDA Grant. The Shareholders complain that Alere received a $12.9 million grant from the Biomedical Advanced Research and Development Authority (“BARDA”) for the rapid diagnosis of influenza, and opted not to use that funding to develop an RPA instrument for TwistDx.
Section 7.10(a) of the Merger Agreement makes clear, however, that Alere was not required to dedicate these grant funds to TwistDx product development. If TwistDx had applied for and received grant funding, then under the Merger Agreement it was entitled to spend those funds in addition to other amounts
 
--------------------------------------------
 
[6] The Shareholders waived any other claimed basis for their implied covenant claim by not raising it in their written opposition. A party that opposes a motion in the Superior Court must submit a memorandum “that includes a statement of reasons, with supporting authorities, that the motion should not be allowed.” Sup. Ct. Rule 9A(a)(2). Grounds for opposing a motion that are not raised in the written opposition are waived. See Porter v. Board of Appeal of Boston, 103 Mass. App. Ct. 685, 686–687 (2024); Tortolano v. Lemuel Shattuck Hosp., 93 Mass. App. Ct. 773, 779–780 (2018).
The Shareholders filed a 20-page memorandum in opposition to summary judgment, and also tried to incorporate by reference pages addressing the implied covenant claim in their prior, 2022 opposition to Alere’s motion dismiss. That is improper. In the Superior Court, legal memoranda may not exceed 20 pages without leave of court. See Super. Ct. Rule 9A(a)(5)(iv). The Court declines to consider arguments not made in the Shareholders’ summary judgment opposition but purportedly incorporated by reference from a prior filing. See Bresler v. Muster, 496 Mass. 111, n.3 (2025) (parties may not incorporate by reference arguments set forth in some prior memorandum, as doing so does not rise to level of argument and would undermine page limits).
 
                                                            -10-
 
budgeted by Alere. The last sentence of § 7.10(a) states that, “Any grant funds successfully applied for and received by the management of [TwistDx] and approved by [Alere] will be in addition to those allocated in the budget and will not be offset against the agreed upon budget.” But the BARDA grant was awarded to and received by Alere, not TwistDx.
Since the express terms of the Merger Agreement did not require Alere to spend for the benefit of TwistDx any grant funds that were awarded to and received by Alere, the implied covenant did not do so either. The covenant “does not supply terms that the parties were free to negotiate, but did not, nor does it ‘create rights and duties not otherwise provided’ for in the contract.” Eigerman, 450 Mass. at 288, quoting Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007), quoting in turn Ayash, 443 Mass. at 385.
In any case, this aspect of the implied covenant claim is time-barred. The Shareholders say that BARDA publicly awarded its grant to Alere in 2014, and that Alere used the funds from the start for purposes unrelated to TwistDx. They contend, based on Dr. Armes’ affidavit, that “TwistDx was instrumental in securing” BARDA’s grant to Alere. The only reasonable inference is that TwistDx knew about the grant at the time, and also knew that Alere was not using the grant in the way that TwistDx preferred. It therefore appears that this part of the implied covenant claim accrued by sometime in 2015, if not earlier. The Shareholders did not file this lawsuit until May 3, 2022, well over six years later. This claim is therefore barred by the six-year statutory limitations period. See G.L. c. 260, § 2.
2.2. RPA Instrument. The Shareholders complain more generally that Alere did not “develop an instrument suitable for RPA technology,” without regard to whether it was funded out of the BARDA grant, and assert that this constituted a further breach of the implied covenant.
As discussed above in § 1.1 of this decision, the Merger Agreement did not require Alere to develop an RPA instrument using non-TwistDx resources.
Once again, since the parties did not include any such express requirement in their contract, the implied covenant does not create one either. See Eigerman, 450 Mass. at 288; Chokel, 449 Mass. at 276; Ayash, 443 Mass. at 385.
This is not a case of a party taking an “extreme and unwarranted view” of their rights or obligations under a contract, and thereby violating the implied covenant. Contrast Robert and Ardis James Foundation v. Meyers, 474 Mass. 181,
 
                                                            -11-
 
191 (2016). Since the Shareholders concede that the Merger Agreement is says nothing about Alere being required to develop an RPA instrument for TwistDx, the Shareholders could not have had “reasonable expectations” that Alere was contractually obligated to do so, and thus the implied covenant is not implicated. See Chokel, 449 Mass. at 276.
3. Unfair or Deceptive Trade Practices. Finally, Alere is entitled to summary judgment on Count IV because the Shareholders have failed to muster evidence sufficient to prove that Alere committed an unfair or deceptive act or practice that violated G.L. c. 93A. The Shareholders contend in their written memorandum that Alere violated c. 93A in two different ways. Neither aspect of this claim can survive summary judgment.[7]
3.1. No False Promise. The Shareholders contend that Alere led TwistDx to believe that successful tests for the bacterium known as c. diff (Clostridioides difficile) or for noroviruses would count as New Company Products that would entitle the Shareholders to earnout payments, but then told its accountants that those tests did not trigger product milestones after all (though revenues generated would count toward revenue milestones).
The Shareholders have not mustered evidence sufficient to create any triable issue about whether this would constitute a violation of G.L. c. 93A for three, independent reasons.
First, this argument is based entirely on a conclusory assertion in Dr. Armes’ affidavit that is not admissible evidence. Dr. Armes states that he “was led to believe” that if TwistDx obtained regulatory approval for RPA tests for c. diff or norovirus then those tests would be treated as “New Company Products” for purposes of earning product milestone compensation. But Dr. Armes does not identify any written or oral communication in which any Alere or Abbott representative actually said this. Instead, Dr. Armes seems to be describing his impression or opinion, not recounting any actual communications.
Since this part of Dr. Armes affidavit does not recount facts, but instead describes Mr. Armes’ personal opinion, it is not admissible and thus cannot be considered in deciding the motion for summary judgment. See Somers v. Converged  Access,  Inc.,  454  Mass.  582,  597  (2009)  (inadmissible  lay opinion
 
--------------------------------------------
 
[7]        The Shareholders waived any other potential basis for Chapter 93A claim . See Porter, 103 Mass. App. Ct. at 686–687; Tortolano, 93 Mass. App. Ct. at 779–780.
 
                                                            -12-
 
cannot be considered in evaluating summary judgment motion); Borella v. Renfro, 96 Mass. App. Ct. 617, 625 n.22 (2019) (same).
Second, TwistDx’s management could not reasonably have relied upon an alleged assurance that Shareholders could receive earnout compensation by treating successful tests for c. diff or norovirus as “New Company Products” within the meaning of the Merger Agreement, because that would have been inconsistent with the plain language of the Merger Agreement.
The contractual definition of the term in § 1.1 of the Merger Agreement limits “New Company Products” to those listed in Schedule 7.10(a), which did not include c. diff or norovirus as covered products. This definition required that any amendment to Schedule 7.10(a) had to be “in writing and executed by both” Alere and the Shareholders’ Representative. There is no evidence of any qualifying amendment to the list of New Company Products. Indeed, when Dr. Armes was asked during his deposition about a presentation by the TwistDx team to Abbot, he acknowledged (at pages 209–210) that neither c. diff nor norovirus was a “New Company Product” target.
Under these circumstances, TwistDx could not have reasonably relied upon Dr. Armes’ impression that Alere would treat tests for c. diff or norovirus as “New Company Products.” See, e.g., Arabian Support & Services Co., Ltd. v. Textron Sys. Corp., 943 F.3d 42, 48 (1st Cir. 2019) (plaintiff could not have reasonably relied on promises of commission for assisting in selling cluster bombs where written consulting agreements prohibited commission from weapons sales).
“It is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract.” Masingill v. EMC Corp., 449 Mass. 532, 541 (2007); accord, e.g., Kuwaiti Danish Computer Co. v. Digital Eqpt. Co., 438 Mass. 459, 468 (2003).
Third, in any case, the summary judgment record establishes that the center of gravity of Alere’s alleged deception regarding what would constitute “New Company Products” was not in Massachusetts.
The Shareholders seek to hold Alere liable G.L. c. 93A, § 11. By statute, no action may be maintained under § 11 unless the allegedly “unfair or deceptive act or practice occurred primarily and substantially within” Massachusetts. See G.L. c. 93A, § 11.
The burden of proof is on Alere to prove that the conduct that constitutes the allegedly unfair or deceptive act or practice did not occur primarily and
 
                                                            -13-
 
substantially in Massachusetts. See G.L. c. 93A, § 11; Kuwaiti Danish Computer Co., 438 Mass. at 470 & n.11. “The analysis required under § 11 does not turn on any specific factors and instead involves determining whether the center of gravity of the circumstances that give rise to the claim’ occurred here.” FTI, LLC v. Duffy, 104 Mass. App. Ct. 484, 488, review denied, 495 Mass. 1103 (2024), quoting Kuwaiti Danish Computer, supra, at 473.
To determine the center of gravity, the court should look “only to the allegedly unscrupulous conduct” and consider all the relevant circumstances, including where the misconduct and where the loss occurred. Skyhook Wireless, Inc. v. Google, Inc., 86 Mass. App. Ct. 611, 622 (2014). In other words, “only the allegedly unfair and deceptive conduct may be considered; ‘[c]ontacts with Massachusetts that were neither unfair nor deceptive do not play a part in this assessment.’ ” Armstrong v. White Winston Select Asset Funds, LLC, 648 F.Supp.3d 230, 270 (D.Mass. 2022) (Dein, M.J.) (punctuation cleaned up), quoting AECOM Tech. Servs. Inc. v. Mallinckrodt LLC, 117 F.Supp.3d 98, 106 (D.Mass. 2015) (Saris, C.J.).
Where the relevant facts are not in dispute, this issue may be resolved on summary judgment. See Skyhook Wireless, 86 Mass. App. Ct. at 622–623.
Here, the only information that the Shareholders have provided about the purported misrepresentation regarding c. diff and norovirus products is that it was somehow communicated to Dr. Armes in the United Kingdom and acted on there by Armes and other TwistDx employees. The record therefore establishes that this allegedly unfair and deceptive conduct did not occur primarily and substantially in Massachusetts. Alere is entitled to summary judgment in its favor on this aspect of the c. 93A for this reason as well.
3.2. No Unlawful Retaliation. The Shareholders contend that Alere also violated c. 93A by terminating quarterly Non-IVD Payments in retaliation for the Shareholders asserting claims under the Merger Agreement. Alere is entitled to summary judgment in its favor on this aspect of the c. 93A claim for two, independent reasons.
First, Alere’s contractual obligation to pay the Shareholders one-half of any Non-IVD Revenues ended on May 8, 2021, and thus withholding such payments after that date could not have been unlawful retaliation in violation of public policy and cannot support any finding that Alere violated c. 93A. Contrast Kattar v. Demoulas, 433 Mass. 1, 13 (2000) (exercising right to foreclose
 
                                                            -14-
 
mortgage as retribution for refusal to testify was against public policy and constituted unfair trade practice that violated c. 93A).
The Merger Agreement provided in § 3.14(c) that Alere’s obligation to report and pay to shareholders one-half of any Non-IVD Revenues ended as of the “seventh (7th) anniversary of the first commercial sale of the First Milestone Product for which Contingent Merger Consideration.” It appears to be undisputed that the first such commercial sale took place on May 8, 2014. Alere was therefore within its contractual rights to stop making Non-IVD Payments to the Shareholders after May 8, 2021.
In any case, even if Alere had engaged in unlawful retaliation, it could not be held liable for it under G.L. c. 93A, § 11, because the center of gravity for this alleged misconduct was outside of Massachusetts. During the relevant time period, business strategy decisions for Alere were made by Abbott personnel based in Illinois. The effect of the termination of Non-IVD Payments was felt by the Shareholders themselves, not by TwistDx. Although the Shareholders’ Representative (Nagesh Mahanthappa) and some other Shareholders appear to reside in Massachusetts, Dr. Armes and many other Shareholders do not. Any reasonable jury would be persuaded on this record that the allegedly unfair conduct concerning cessation of these earnout payments was not primarily and substantially in Massachusetts.
ORDER
Defendants’ motion for summary judgment (docket no. 61) is allowed. Final judgment shall enter in Defendants’ favor, providing that Plaintiffs shall take nothing on their claims.
/s/Kenneth W. Salinger Justice of the Superior Court
March 4, 2026